# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

---

JOHN K. WAHRMANN,

                              Plaintiff,

          v.                                   6:13-CV-0431
                                                  (DNH/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.

---

JOHN K. WAHRMANN, plaintiff, pro se
TOMASINA DIGRIGOLI, ESQ., for defendant

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

      This matter was referred to me for report and recommendation by the Honorable David N. Hurd, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I.   PROCEDURAL HISTORY

      On May 3, 2010, plaintiff protectively filed[1] his application for disability insurance benefits and an application for SSI benefits, claiming disability beginning May 1, 2010. (Administrative Transcript ("Tr.") 155-63, 184, 149-54). Plaintiff's applications were denied initially on November 14, 2010 (Tr. 76, 83, 90-95), and he

---

[1] When used in conjunction with an application for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. See 20 C.F.R. § 404.630. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a future date.

requested a hearing before an ALJ (Tr. 96-98). The hearing, at which plaintiff testified, was conducted on January 26, 2012. (Tr. 28-75).

In a decision dated April 25, 2012, the ALJ found that plaintiff was not disabled. (Tr. 6-23). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on February 19, 2013. (Tr. 1-4).

On April 19, 2013, plaintiff filed a pro se complaint[2] with this court, appealing the Commissioner's decision, along with a motion for leave to proceed in forma pauperis. (Dkt. Nos. 1, 2). This court issued General Order 18, describing the process followed in this District for Social Security appeals. (Dkt. No. 3). Defendant filed an answer and the administrative record on August 16, 2013. (Dkt. Nos. 11, 13). When plaintiff did not file a brief in accordance with General Order 18, the court ordered defendant to file a brief within 60 days, and provided plaintiff with an additional 45 days after that to file a response brief in support of his position. (Dkt. No. 15). Plaintiff did not do so.

## II. FACTS

Defendant's counsel has incorporated the ALJ's summary into her brief. (Def. Br. at 4). This court will also incorporate the facts as stated by the ALJ and defense counsel, with any exceptions as noted in the discussion below.

## III. ALJ's DECISION

The ALJ found that plaintiff had not engaged in substantial gainful activity

---

[2] Although plaintiff is currently appearing pro se, he was represented at the hearing.

since May 1, 2010, the alleged onset date.[3]  (Tr. 11).  The ALJ then found that plaintiff had three "severe" impairments: degenerative disc disease, fibromyalgia, and depressive disorder NOS.[4]  (Tr. 12).  The ALJ concluded, however, that these impairments did not meet the severity of the listed impairments.[5]  (Tr. 14-15).  The ALJ explained that his analysis of plaintiff's limitations in the context of the listed impairments did not constitute an RFC finding, and that his RFC would contain a more detailed assessment of plaintiff's limitations.  (Tr. 15).

The ALJ then proceeded to Step 4 and found that plaintiff had the physical RFC to lift/carry 20 pounds on an occasional basis; lift/carry 10 pounds on a frequent basis;

---

[3]  The ALJ noted that plaintiff received $35,079.06 in earnings during 2010, but that he testified at the hearing that these earnings represented private disability insurance benefits through his union.  (Tr. 11).

[4]  Plaintiff alleged disability due to: fibromyalgia, cervical disc displacement with radiculitis, thoracic disc displacement with radiculitis, lumbar disc displacement with radiculitis, chronic pain, sleep apnea, depression, bipolar disorder, impulse control disorder, concentration and memory problems, trouble grasping with his hands, falling, generalized weakness, constipation, diarrhea, suicidal ideation, anxiety, incontinence, headaches, fatigue, bilateral arm pain, neck pain, bilateral leg pain, bilateral shoulder pain, bilateral foot pain, and back pain.  The ALJ found that plaintiff failed to satisfy his burden of establishing the remaining impairments were "severe" under the applicable regulations as there was no medical evidence to support the existence of any significant limitations due to these conditions.  (Tr. 12).  The ALJ specifically discussed sleep apnea, explaining that the polysomnography study showed only mild obstructive sleep apnea that is being successfully treated with CPAP therapy.  (*Id.*).

[5]  The ALJ explicitly considered sections 1.04 (disorders of the spine) and 12.04 (affective disorders).  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The ALJ found that plaintiff had not experienced the type of severe nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in an inability to ambulate effectively for the period of time required under the regulations as a result of his degenerative disc disease.  (Tr. 14).  The ALJ then found that plaintiff did not have at least two "marked" limitations in activities of daily living, social functioning, concentration, persistence, and pace.  (Tr. 15).  Nor did plaintiff have one "marked" limitation and "repeated" episodes of decompensation "each of extended duration."  (*Id.*).  The ALJ further noted that there was no evidence to show that plaintiff would decompensate if he experienced minimal increases in mental demands or a change in environment, nor a current history of one or more years' inability to function outside a highly supportive living arrangement.  (*Id.*).

sit for a total of six hours; stand/walk for a total of six hours; and occasionally climb, balance, stoop, kneel, crouch, and crawl. The ALJ further found that despite plaintiff's claimed difficulty maintaining concentration, persistence and pace, plaintiff would be capable of performing low-stress work requiring only occasional decision-making, occasional changes in the work setting, occasional judgment, and occasional interaction with the public, co-workers, and supervisors. (Tr. 15, 18).

The ALJ analyzed plaintiff's symptoms and determined that despite plaintiff's claimed lower extremity pain and weakness and back pain, there were minimal positive diagnostic and clinical findings to corroborate these complaints. The ALJ found that the significant gaps in plaintiff's medical and psychiatric treatment history were inconsistent with plaintiff's complaints of continued pain and psychiatric problems. (Tr. 18). The ALJ found that while plaintiff's impairments could reasonably be expected to cause the alleged symptoms, the reported intensity, persistence and limiting effects were not fully credible. (Tr. 18). The ALJ further observed that plaintiff's credibility was weakened by his failure to report his alcohol history to a consultative examiner, and by the observations of his treating providers who found him to be "an unreliable historian and . . . manipulative," and who believed that "there was a psychogenic origin" to some of his complaints. (Tr. 18-19).

The ALJ concluded that plaintiff's subjective complaints of pain could not overcome the medical opinions in the record, which did not support the existence of a disabling impairment. (Tr. 20). The ALJ cited reports authored by Roberto Rivera, M.D.; Dennis Noia, M.D.; H. Ferrin; and Stephen Hudyncia, M.D. (Tr. 19-20). The ALJ also discussed the observations of plaintiff's treating pain management provider

4

and treating nurse practitioner. (Tr. 19). The ALJ assigned great weight to Dr. Rivera's consultative internal medicine examination. Dr. Rivera opined that plaintiff had no limitations to sitting or standing, but as a result of his lower back pain, had mild limitations to walking, lifting, and carrying; and mild to moderate limitations to pushing and pulling. (Tr. 19). The ALJ further noted that there were no opinions from treating sources regarding plaintiff's physical limitations. (Tr. 19).

The ALJ assigned significant weight to Dr. Noia, who performed a psychiatric examination of plaintiff and opined that despite having some difficulty dealing with stress, plaintiff could understand and follow simple instructions and directions; perform simple and some complex tasks with supervision and independently; maintain attention and concentration for tasks; regularly attend to a routine and maintain a schedule; learn new tasks; make appropriate decisions; and relate to and interact moderately well with others. (Tr. 19). The ALJ placed substantial weight on the RFC assessment completed by the State Agency review psychologist, Dr. Ferrin, who determined that plaintiff was still capable of handling both the simple and most of the complex work-related tasks within a work setting. (Tr. 20). The ALJ assigned little weight to the medical source statement completed by Dr. Hudyncia, observing that there was no evidence suggesting that plaintiff was treated by Dr. Hudyncia, and that his restrictive opinion "contrasts sharply with the other opinions of record." (Tr. 20).

The ALJ next determined that plaintiff would be unable to perform his past relevant work as a security officer and licensed practical nurse, and analyzed whether, considering his age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that he could perform. (Tr. 20-22).

5

Based on the physical limitations in the ALJ's RFC determination, the ALJ found that plaintiff would be able to perform the full range of light work. (Tr. 21). However, the ALJ then considered plaintiff's nonexertional limitations, concluding that his postural restrictions had very little impact on the occupational base for unskilled light work, and that despite his nonexertional mental limitations, he "continues to possess the ability, on a sustained basis, to understand, carry out, and remember simple instructions; respond appropriately to supervision, co-workers, and usual work situations; and deal with changes in a routine work setting. (Tr. 22). The ALJ determined that plaintiff maintained the capacity to meet the three basic mental demands required for competitive and remunerative unskilled work. (*Id.*). The ALJ found that the testimony of a vocational expert was unnecessary as plaintiff's nonexertional limitations would have "little or no effect" on his occupational base. (*Id.*). Therefore, the ALJ found that plaintiff was not disabled.

## IV. APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of

6

substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [per se] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's residual

functional capacity"); *Selian*, 708 F.3d at 418 & n.2.

### B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417 (quoting *Talavera v. Astrue*, 697 F.3d at 151; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera*, 697 F.3d at 151 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

In order to determine whether an ALJ's findings are supported by substantial evidence, the reviewing court must consider the whole record, examining the evidence from both sides, "'because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'" *Petrie v. Astrue*, 412 F. App'x 401, 403-404 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support of the ALJ's decision. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citing *Williams*, *supra*).

## V.   ISSUES IN CONTENTION

As noted above, plaintiff has not filed a brief in support of his position.[6]  The Commissioner argues that the ALJ's decision is supported by substantial evidence and must be affirmed.  The court concludes, for the reasons set forth below, that the ALJ properly evaluated the medical opinions of record and plaintiff's credibility and that substantial evidence supports the ALJ's RFC determination.  The court further concludes that the ALJ properly determined that there are jobs that exist in significant numbers in the national economy that plaintiff can perform.

## VI.   DISCUSSION

### A.   Severe Impairment

#### 1.   Legal Standards

The claimant bears the burden of presenting evidence establishing severity at Step 2 of the disability analysis.  *Briggs v. Astrue*, No. 5:09-CV-1422 (FJS/VEB), 2011 WL 2669476, at *3 (N.D.N.Y. Mar. 4, 2011)  (Report-Recommendation), *adopted*, 2011 WL 2669463 (N.D.N.Y. July 7, 2011).  A severe impairment is one that significantly limits the plaintiff's physical and/or mental ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521(a) (noting that an impairment is not severe at Step 2 if it does not significantly limit a claimant's ability to do basic work activities).  The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include, (1)

---

[6]  The court has, despite plaintiff's failure to file a brief, examined the record to determine whether the ALJ applied the correct legal standards and reached a decision based on substantial evidence.  *See, e.g., Collins v. Comm'r of Soc. Sec.*, 960 F. Supp. 2d 487, 498 (S.D.N.Y. 2013) (liberally construing pro se papers and reviewing Commissioner's decision for substantial evidence notwithstanding lack of argument from pro se plaintiff).

physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). It is quite clear from these regulations that "severity" is determined by the limitations imposed by an impairment, and not merely its by diagnosis. The "presence of an impairment is . . . not in and of itself disabling within the meaning of the Act." *Coleman v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y. 1995) (citations omitted).

An ALJ should make a finding of "'not severe' . . . if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3). The Second Circuit has held that the Step 2 analysis "may do no more than screen out de minimis claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). If the disability claim rises above a de minimis level, then the remaining analysis of the claim at Steps 3 through Step 5 must be undertaken. *Id.* at 1030.

Often when there are multiple impairments, and the ALJ finds some, but not all of them severe, an error in the severity analysis at Step 2 may be harmless because the ALJ continued with sequential analysis and did not deny the claim based on the lack of a severe impairment alone. *Tryon v. Astrue*, No. 5:10-CV-537, 2012 WL 398952,

at *3 (N.D.N.Y. Feb. 7, 2012) (citing *Kemp v. Commissioner of Soc. Sec.*, No. 7:10-CV-1244, 2011 WL 3876526, at *8 (N.D.N.Y. Aug. 11, 2011)). This is particularly true because the regulations provide that combined effects of all impairments must be considered, regardless of whether any impairment, if considered separately, would be of sufficient severity. 20 C.F.R. §§ 404.1523, 416.923; *Dixon*, 54 F.3d at 1031.

### 2. Application

Here, at step two of the disability analysis, the ALJ found that plaintiff's degenerative disc disease, fibromyalgia, and depressive disorder were severe impairments. He did not specifically find that plaintiff's joint pain, difficulty grasping, falling down, weakness, and remaining complaints were severe impairments. He further found that plaintiffs's sleep apnea was not a severe impairment.[7]

The court notes that in considering plaintiff's fibromyalgia and disc disease, the ALJ considered plaintiff's other physical complaints in his subsequent analysis. Plaintiff's complaints of weakness and bilateral pain were discussed by the health care professionals who diagnosed plaintiff with fibromyalgia and/or degenerative disc disease. The ALJ explained that plaintiff's sleep apnea was not a severe impairment because an August 4, 2011 polysomnography study revealed only mild obstructive sleep apnea and plaintiff was treated for this condition with a continuous positive air pressure ("CPAP") machine that he was instructed to use every day during sleep. There is no evidence in the record that plaintiff experienced any limitations as a result

---

[7] At the hearing, plaintiff stated that fibromyalgia and depression were his main complaints. (Tr. 46).

of his sleep apnea. Indeed, in July 2009, plaintiff explained to his medical provider that he did not fill the prescription for a new CPAP because he did not feel it was "as big an issue as he thought." (Tr. 332). In March 2011, the medical records indicate that plaintiff was not using his sleep apnea machine. (Tr. 460-62). The ALJ's analysis that plaintiff's sleep apnea and other complaints were not severe impairments is supported by substantial evidence.[8]

## B. RFC/Treating Physician/Credibility

### 1. Legal Standards

#### a. RFC

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945; *see also Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Id.* (citing, *inter alia*, *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984)). RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.* (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). The RFC assessment must also include a narrative

---

[8] Moreover, finding that three of plaintiff's impairments were "severe" led the ALJ to continue to the other steps of the sequential disability analysis. After the step two analysis, the ALJ, as required, considered all of plaintiff's impairments even if all were not severe. 20 C.F.R. § 404.1523. For example, in determining plaintiff's RFC, the ALJ considered "all symptoms" including those associated with pervasive pain, generalized weakness, bipolar disorder, and impulse control disorder. (Tr. 15-17). Therefore, any error in not finding plaintiff's remaining claimed impairments "severe," was harmless.

discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120 (DNH/GHL), 2010 WL 3825629, at *6 (N.D.N.Y. Aug. 17, 2010) (citing SSR 96-8p, 1996 WL 374184, at *7).

Although the RFC determination is reserved for the commissioner, the RFC assessment is still a medical determination that must be based on medical evidence of record, and the ALJ may not substitute his own judgment for competent medical opinion. *Walker v. Astrue*, No. 08-CV-828, 2010 WL 2629832, at *6 (W.D.N.Y. June 11, 2010) (citing 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2)) (Report-Recommendation), *adopted*, 2010 WL 2629821 (W.D.N.Y. June 28, 2010); *Lewis v. Comm'r of Soc. Sec.*, No. 6:00-CV-1225, at *3 (N.D.N.Y. Aug. 2, 2005)). In addition to the plaintiff's own physicians and other medical sources, the ALJ may rely upon a "medical advisor" who is a non-examining state agency "medical consultant" or an examining consultative physician to whom the plaintiff was sent at agency expense. *See Walker v. Astrue*, 2010 WL 2629832 at *6-7. "It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (genuine conflicts in the medical evidence are for the Commissioner to resolve).

### b.    Treating Physician

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating

physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *see also Kennedy v. Astrue*, 343 F. App'x 719, 721 (2d Cir. 2009) (declining to afford great weight to the treating physician's "check-off form regarding residual functional capacity" explaining that a treating physician's opinion need not be given great weight when it is not consistent with other substantial evidence of record, including the opinions of other medical experts) (citing *Halloran*).

When controlling weight is not given, the ALJ should consider the following factors to determine the proper weight assigned to a treating physician's opinion: (1) frequency of the examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; and (4) whether the opinion is from a specialist. *See* 20 C.F.R. § 404.1527(c); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). The ALJ must properly analyze the reasons that the report of the treating physician is rejected. *Halloran*, 362 F.3d at 32-33.

### c.    Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999)). To satisfy the

substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. *See* 20 C.F.R. § 404.1529; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged. . . ." 20 C.F.R. § 404.1529(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id.* § 404.1529(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* § 404.1529(c)(3).

### 2. Application

The court finds that the ALJ gave proper weight to the medical opinions, and

appropriately assessed plaintiff's credibility in determining plaintiff's RFC.  As noted above, the ALJ concluded that plaintiff could lift/carry 20 pounds on an occasional basis; lift/carry 10 pounds on a frequent basis; sit for a total of six hours; stand/walk for a total of at least six hours; and occasionally climb, balance, stoop, kneel, crouch, and crawl.  He further found that plaintiff retains the ability to perform low-stress work that requires only occasional decision-making, occasional changes in the work setting, occasional judgment, and occasional interaction with the public, co-workers, and supervisors.

### a.   Medical Evidence

With respect to plaintiff's physical limitations, the ALJ gave great weight to the opinion of Dr. Rivera, a consultative examiner.  Dr. Rivera observed that plaintiff walked with a normal gait with and without a cane, and further noted that the cane appeared to be "used essentially for gait instability possibly secondary to psychological problems."  (Tr. 397).  He did not need help changing, or getting on or off the examination table.  (Tr. 398).  Plaintiff was also able to rise from a chair without difficulty, and there was full range of motion of plaintiff's cervical spine, shoulders, forearms, elbows, wrists, knees, and ankles.  (Tr. 398).  Plaintiff's joints were stable and nontender.  (Tr. 398).  Plaintiff's strength was normal at 5/5 in both upper and lower extremities, and plaintiff's grip strength was also normal.  (Tr. 399).

As noted by the ALJ, there was not a medical source statement in the record from a treating physician regarding plaintiff's physical limitations.  (Tr. 19).  It appears that plaintiff was primarily treated for his physical impairments by Susan Lindberg, NP and his pain management provider, Debra Dermady, NP.  According to

the applicable regulations, a nurse practitioner is not an "acceptable medical source" for determining the existence of an impairment.[9]  In any event, the ALJ did discuss the treatment notes of these providers.[10]  Dermady and Lindberg frequently expressed the opinion that plaintiff's physical limitations were unexplainable, and likely had a psychogenic component.[11]  Additionally, on August 9, 2010, his pain management provider found that he was able to go back to work with certain limitations.  (Tr. 361-63 (finding that plaintiff could return to limited duty, lifting not more than 20 pounds with frequent rest periods)).

---

[9]  In addition to "acceptable medical sources," the ALJ may consider "evidence from 'other sources,' as defined in 20 C.F.R. §§ 404.1513(d) and 416.913(d), to show the severity of the individual's impairment(s) and how it affects the individual's ability to function."  Social Security Ruling 06-03p, 2006 WL 2329939, at *2 (2006).  Included in this category of "other sources" are nurse practitioners.  *Id.*  In weighing the opinions of "other sources," the ALJ may use the same factors for the evaluation of the opinions from "acceptable medical sources" enumerated in 20 C.F.R. §§ 404.1527(d) and 416.927(d).  *Id.* at 4-5.

[10]  The court observes that an ALJ has an affirmative duty to develop the medical record if it is incomplete.  *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); 20 C.F.R. § 404.1512(d), 416.912(d) ("We will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports.").  Furthermore, "[t]he duty of an ALJ to develop the record is 'particularly important' when obtaining information from a claimant's treating physician due to the 'treating physician' provisions in the regulations."  *Dickson v. Astrue*, 1:06-CV-511 (NAM/GHL), 2008 WL 4287389, at *13 (N.D.N.Y. Sept. 17, 2008) (citing *Devora v. Barnhart*, 205 F. Supp. 2d 164, 172 (S.D.N.Y. 2002)).  However, although the ALJ must attempt to fill in any "clear gaps" in the administrative record, "where there are no obvious gaps . . . and where the ALJ already possesses a 'complete medical history,'" the ALJ is under no obligation to seek additional information.  *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999).  As noted above, plaintiff primarily treated with two nurse practitioners whose opinions were considered by the ALJ.  There do not appear to be any clear gaps in the record, or any other medical records that the ALJ should have requested.  The court therefore concludes that there was no gap in the medical evidence such that any other treating source statement was necessary for the ALJ to make a disability determination.

[11]  It appears that plaintiff's medical providers believed that his physical problems had a psychogenic component dating back to 2008.  (Tr. 241-42) ("John also reports that his medical doctor feels that he doesn't have any medical illness.  It is all in his head and [he] should be talking to a psychiatrist about his medical problems.").

On January 15, 2009, x-rays of plaintiff's lumbar spine were normal. On December 23, 2009, a CT scan of plaintiff's cervical spine showed degenerative changes, but no evidence of fracture or malalignment. An MRI performed on May 14, 2009 showed disc protrusions at multiple levels with cord compression at three levels and neural foraminal narrowing at four levels. However, Dr. Rivera reported that plaintiff walked with a normal gait both with and without a cane, and no medical provider opined that plaintiff's back issues resulted in specific physical limitations. In June 2010, plaintiff demonstrated a full range of motion, good strength both upper and lower, and some spinal tenderness. (Tr. 324-25). On July 7, 2010, plaintiff's range of motion was found to be within functional limits. (Tr. 379-80). He was able to ambulate independently and dress himself; and he was noted as moderately independent in homemaking. Plaintiff reported a moderate-severe increase in pain upon riding long distances, but his rehabilitation potential was found to be good. (*Id.*). To the extent the record supported a finding that the plaintiff faced physical limitations,[12] those limitations were clearly incorporated into the ALJ's RFC determination that plaintiff was limited to light work.[13]

With respect to plaintiff's mental abilities, the ALJ gave significant weight to

---

[12] For example, plaintiff's physical therapy evaluation noted plaintiff's reported pain and found decreased range of motion/strength, and recommended initiation of fibromyalgia/chronic pain pathway. (Tr. 377-78). However the court notes that two weeks later his range of motion was found to be "within functional limits." (Tr. 379-80).

[13] The court further observes that although the medical records demonstrate a vague diagnosis of fibromyalgia, there is no evidence of record to indicate that any acceptable medical source has clearly diagnosed this condition in accordance with the criteria set forth by the American College of Rheumatology. In any event, the mere diagnosis of fibromyalgia without a finding as to the severity of the symptoms and limitations does not mandate a finding of disability. *Rivers v. Astrue*, 280 F. App'x 20, 22 (2d Cir. 2008).

the opinion of Dr. Noia, a consultative examiner. Plaintiff reported to Noia that he was able to dress, bathe, and groom himself on a regular basis, and that he spent his days doing some light chores, spending time with his wife and using a computer. During the examination, plaintiff was cooperative, he was appropriately dressed, his personal hygiene and grooming were good, his eye contact was appropriate, his expressive and receptive language was adequate, his attention and concentration were intact, and he was able to do counting, simple calculations, and serial threes. His insight and judgment were fair. (Tr. 404). Dr. Noia found that while plaintiff's prognosis was "guarded," he appeared capable of understanding and following simple instructions and directions, performing simple and some complex tasks with supervision and independently, maintaining attention and concentration for tasks, regularly attending to a routine and maintaining a schedule, learning new tasks, making appropriate decisions, and relating to and interacting moderately well with others. (Tr. 405). Dr. Ferrin, the State Agency consultant similarly found that plaintiff could handle simple, and most of the complex, work-related tasks in a work setting.[14]

These opinions are consistent with the remaining mental health treatment records. Plaintiff was hospitalized for a few days for depression and suicidal ideation from November 10, 2008 to November 12, 2008–before his alleged disability onset

---

[14] Dr. Ferrin did not find plaintiff to be markedly limited in any category. He found plaintiff to be moderately limited in his ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. 406-19).

date. (Tr. 236-42). During this inpatient admission, the records indicate that he was an "unreliable historian," he "appeared to be manipulative," and "was not cooperative with the staff." (Tr. 237-38).[15] Plaintiff began treating with Dr. Omidian at Mental Health Connections in December 2008. Dr. Omidian noted plaintiff's "longstanding history of psychiatric difficulty," but found that he expressed insight and judgment seemed to be fine. (Tr. 289-90). In October 2009, plaintiff began seeing Dr. Langer, who found no evidence of any overt psychosis and found that "[c]ognitively, he was grossly intact." (Tr. 273). Plaintiff was again hospitalized from February 5, 2010 to February 16, 2010–before his alleged onset date–for suicidal ideations and dysphoric mood. At the time of this admission, plaintiff had discontinued use of his medications and had been drinking heavily. (Tr. 292-95, 318). In November 2010, plaintiff's GAF was found to be 50. (Tr. 440-41).

The court finds that the ALJ properly only gave little weight to the opinion of Dr. Hudyncia. As the ALJ noted, Dr. Hudyncia does not appear to be plaintiff's treating physician. Despite the fact that plaintiff referred to Dr. Hudyncia as his treating physician, there are no treatment records from Dr. Hudyncia in the record.[16] Additionally, Dr. Hudyncia's opinion that plaintiff was markedly limited in his ability

---

[15] During this stay, plaintiff's GAF scores were found to be 50 and 40. The GAF is a 100 point scale, and 41-50 indicates "serious symptoms," 51-60 indicates "moderate symptoms," 61-70 indicates individuals that have mild symptoms or some difficulty in social, occupational, or school settings but generally function well, and the 71-80 range is for patients responding appropriately to stress. AMERICAN PSYCHIATRIC ASSN., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-34 (4th Ed. Text Revision 2000) (DSM-IV-TR).

[16] The court also notes that during the hearing, plaintiff stated that Dr. Hudyncia works at Mental Health Connections and provides plaintiff with medications once a month, but does not provide therapy services. (Tr. 49).

to make judgments on simple work-related decisions, on complex work-related decisions, and in his ability to interact appropriately with supervisors is inconsistent with the remaining medical evidence of record, as discussed above.

### b.    Credibility

In reaching his RFC assessment, the ALJ applied the appropriate framework to evaluate the credibility of plaintiff's statements about his symptoms and limitations. Plaintiff claimed that he only showers one to two times per week, or for special occasions; that sometimes it is too painful to dress so he keeps the same clothes on for days; that sometimes it is impossible for him to feed himself; and that he needs constant encouragement and physical assistance with cleaning, laundry and simple repairs.  (Tr. 190-91).  He further claimed that at times he is unable to lift, stand, walk, sit, climb stairs, kneel, and squat; that he sometimes drops things; and that he sometimes collapses without warning.  (Tr. 195).  The ALJ concluded that, while there was some evidence to support plaintiff's claimed limitations, they were not fully credible.  Although plaintiff expressed a very restrictive view of his ability to function, many of his allegations were both internally inconsistent and inconsistent with the medical evidence.

For example, despite his alleged inability to dress, shower, and feed himself, plaintiff admitted that he goes outside almost daily, can go out alone, drives, and shops for food, clothes, and personal items.  (Tr. 192).  Plaintiff also claims that he spends time with others, goes to church, to friends' houses, and does not have problems getting along with family, friends, neighbors or others.  (Tr. 193).  Plaintiff also reported to Dr. Noia that he spends time with his wife and gets along well with

family and friends. (Tr. 405). During the hearing, plaintiff stated that he had a driver's license, drove about one hundred miles a week, and usually drove his wife to work. He also confirmed he attended church, did laundry, cleaned the house, and watched television. (Tr. 70, 74, 72). He spends time listening to the radio and using a computer. (Tr. 397, 405). Dr. Noia found that plaintiff's demeanor and responsiveness to questions was cooperative and his manner of relating, social skills, and overall presentation was adequate. (Tr. 404). He also found that plaintiff's attention and concentration were intact. (Tr. 404). Despite his alleged inability to work, plaintiff further states that he can follow written and spoken instructions and does not have any problems getting along with authority figures. (Tr. 195). Plaintiff further explained in his Disability Report that he "thrives under pressure." (Tr. 196). Additionally, at various points throughout the period of alleged disability, plaintiff himself expressed a desire to return to work. (Tr. 377-78 (stating his to return to work); Tr. 361-63 (noting plaintiff was requesting to return to work)). The court also notes that plaintiff appears to have been suffering from similar issues since at least 2008. (Tr. 377-78 (noting a two year history of pain which is constant but variable in intensity)). Indeed, with respect to his mental problems, plaintiff claims to have been depressed since 1981. (Tr. 237-38). During much of that time period, plaintiff was gainfully employed.

Plaintiff's complaints frequently changed and were difficult for his medical providers to follow. These providers were unable to find causes for many of these

issues.[17]  (Tr. 320-21 ("This patient has been very difficult to diagnose.  He has had multiple complaints of neck pain, loss of memory, back pain, arms feeling painful, legs are giving out on him intermittently . . . ."); Tr. 483-84 (noting, and agreeing that plaintiff's pain management provider stated she was having difficulty treating plaintiff because his symptoms "keep moving all over his body"); Tr. 481-82 ("It is difficult to get a story that makes sense most of the time.")).

The treatment records display a consistent theme of plaintiff complaining about problems with no objective evidence, leaving his providers "at a loss" and believing that his symptoms may be psychosomatic.  (*See, e.g.,* Tr. 284 (plaintiff "complaining of memory problems, however, his memory seemed to be fine"); Tr. 334-35 (noting that plaintiff has multiple complaints but all the testing has been negative); Tr. 327-28 ("I discuss with [plaintiff] about his back pain and his elbow pain with the possibility that it could be psychological pain"); Tr. 320-21 ("I was very [f]rank with him, and said we have done every test, I have sent him to every specialist and I cannot find a reason for all of his symptoms or complaints that he has.  I told him that I am kind of at a loss at the present time to know exactly what to do for him."); Tr. 438 (complaining of being apathetic, "but he did not seem to be apathetic and in fact was quite animated and articulate"); Tr. 515 (plaintiff's pain management provider, Dermady, observing that plaintiff's primary care practitioner, Sue Lindberg agrees "that there is a psychogenic origin to some of" plaintiff's complaints); Tr. 483-84 ("I have difficulty figuring out whether his symptoms are psychosomatic or if they are

---

[17]  Plaintiff's complaints were also inconsistent with the medical evidence.  For example, on 8/28/09, plaintiff told his provider that he was seeing Dr. Omidian for seizures, but there is nothing in Dr. Omidian's treatment notes relating to seizures.  (Tr. 330-31).

physical symptoms, especially because all of the testing that we are doing has been negative except for the degenerative discs."); Tr. 509-12 (finding it unclear why plaintiff is having the alleged symptoms "with a fairly normal exam. It seems to [Dermady] after speaking with Sue Lindberg [that plaintiff] has had the million dollar work up with no specific [diagnosis]")).

The ALJ further noted that plaintiff displayed poor compliance with his medications, and failed to attend many appointments with his treating providers. (*See, e.g.,* Tr. 281-82 (providers expressing concern about plaintiff "not keeping his appointment"); (Tr. 272 (noting "many, many no shows and cancellations"); Tr. 485-86 (plaintiff explained that he had been discharged from therapy at Sitrin Rehab Center because of missed appointments); Tr. 435 (noting on February 18, 2011, that plaintiff had missed two or three appointments with his therapist)). The court also notes that with respect to his back issues, plaintiff stated that he would not have surgery until it got worse. (Tr. 330-31 (8/28/09 plaintiff did not want to have surgery at that time; "pain is fairly well controlled by the Naprosyn and the Gabapentin")). In May 2011, plaintiff declined a recommended surgery, and in September 2011, another provider recommended conservative treatment instead of surgery. (Tr. 503-05, 500-02).

### c.   Conclusion

"It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (genuine conflicts in

the medical evidence are for the Commissioner to resolve). This court concludes that the ALJ's RFC determination was supported by substantial evidence, including the opinions of Drs. Rivera, Noia, Ferrin, and the treatment notes of Debra Dermady and Susan Lindberg. To the extent that the conclusions of Dr. Hudyncia suggested that plaintiff could not perform this work, the ALJ appropriately concluded that the conclusion was inconsistent with other substantial evidence in the record and gave it little weight. The ALJ also correctly determined that plaintiff's subjective complaints were not credible in light of the medical and other evidence.

## C.  Vocational Expert

### 1.  Legal Standards

Once the plaintiff shows that he cannot return to his previous work, the Commissioner bears the burden of establishing that the plaintiff retains the RFC to perform alternative substantial gainful work in the national economy. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). In the ordinary case, the ALJ carries out this fifth step of the sequential disability analysis by applying the applicable Medical-Vocational Guidelines ("Grids"). *Id.* (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)). The Grids divide work into sedentary, light, medium, heavy, and very heavy categories, based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. Pt. 404, Subpt. P, App. 2; *Zorilla v. Chater*, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996); *see also* 20 C.F.R. §§ 404.1567 & 416.967. Each exertional category of work has its own Grid, which then takes into account the plaintiff's age, education, and previous work experience. *Id.* Based on these factors, the Grids help the ALJ determine whether plaintiff can engage in any other substantial

work that exists in the national economy. *Id.*

"Although the grids are 'generally dispositive, exclusive reliance on [them] is inappropriate' when they do not fully account for the claimant's limitations." *Martin v. Astrue*, 337 F. App'x 87, 90 (2d Cir. 2009) (citation omitted). When significant nonexertional impairments[18] are present or when exertional impairments do not fit squarely within grid categories, the testimony of a vocational expert is required to support a finding of residual functional capacity for substantial gainful activity. *McConnell v. Astrue*, 6:03-CV-0521 (TJM), 2008 WL 833968, at *21 (N.D.N.Y. Mar. 27, 2008) (citing, *inter alia*, *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986).

However, "the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines." *Bapp*, 802 F.2d at 603. Rather, only when a claimant's nonexertional limitations "significantly limit the range of work permitted by his exertional limitations" will sole reliance on the Grids be deemed inappropriate. *Id.* at 605-06. Case by case determinations can be difficult when an individual has mental impairments and in Social Security Ruling ("SSR") 85-15, the Social Security Administration has promulgated guidelines and examples that illustrate when a nonexertional limitation will "significantly limit" a claimant's range of work. 185 WL 56857, at *4.

An ALJ may determine whether a plaintiff's mental impairments "significantly

---

[18] A "nonexertional limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c). Mental impairments are clearly nonexertional.

diminish" his or her work capacity by determining whether the plaintiff can meet the basic mental demands of competitive, remunerative, and unskilled work as stated in SSR 85-15. The ruling states that these basic demands include the ability, on a sustained basis, to "understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." *Id.* A substantial loss of the ability to meet any of these demands would severely limit the potential occupational base at any exertional level and would, therefore, "significantly diminish" the plaintiff's work capacity. *See Sipe v. Astrue*, 873 F. Supp. 2d 471 (N.D.N.Y. July 3, 2012). This would prohibit use of the Grids and necessitate the use of a VE to determine whether there would be any jobs left in the national economy that plaintiff could perform.

### 2. Application

Despite plaintiff's mental (nonexertional) impairments, the court finds that the ALJ did not err by not calling a VE to determine whether plaintiff could perform other work in the national economy at step five. The ALJ first found that based on plaintiff's physical ability to perform light work, and upon his age, education, and prior work experience, the Grid dictated a finding of not disabled. The ALJ then properly considered plaintiff's nonexertional impairments. The ALJ found that the nonexertional impairments had "little or no effect on the occupational base" of unskilled light work. As required by SSR 85-15, the ALJ then discussed the "basic mental demands of competitive, remunerative, unskilled work" that would be required at any exertional level. These demands include the sustained ability to understand, carry out and remember simple instructions; to respond appropriately to supervision,

coworkers, and usual work situations; and to deal with changes in a routine work setting. The ALJ found that plaintiff was able to perform these basic functions of unskilled work, and using the Grid, found that plaintiff was not disabled.

The ALJ's determination is supported by substantial evidence. Dr. Noia's report states that plaintiff can perform substantially all of the basic functions outlined by the ALJ. A review of Dr. Ferrin's report also shows that plaintiff can perform substantially all of the basic mental functions required. The ALJ also addressed plaintiff's limitation to occasional climbing, balancing, stooping, kneeling, crouching, and crawling, noting that most light jobs required only occasional bending and stooping. He further found that the limitation on climbing or balancing, and an inability to ascend or descend scaffolding, poles, and ropes does not ordinarily have a significant impact on plaintiff's ability to perform unskilled light work. (Tr. 22; SSR 85-15, 83-14).

By finding that plaintiff did not have a substantial loss in the ability to meet any of the basic mental demands of unskilled work, the ALJ properly determined that plaintiff's nonexertional impairments did not significantly reduce the available jobs in the light category, and his decision not to call a VE is supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and plaintiff's complaint **DISMISSED IN ITS ENTIRETY**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the

Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: August 19, 2014

Hon. Andrew T. Baxter
U.S. Magistrate Judge